UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CR-80007-LEIBOWITZ

UNITED STATES OF AMERICA,
        Plaintiff,

vs.

MICHAEL SHAPIRO,
        Defendant.
_____/

## DEFENDANT'S OBJECTIONS TO PRE-SENTENCE REPORT

The Defendant, Michael Shapiro, through counsel, files the following Objections to the Pre-Sentence Investigation Report ("PSI") in this case. In support thereof, the Defendant states the following objections:

### OBJECTION I

**A two-level offense level increase for allegedly involving "more than two threats" is inappropriate where (1) Mr. Shapiro was indicted under a single count for leaving "a voicemail recording" "with the intent to communicate a threat"; (2) the threat was made with little deliberation while intoxicated; (3) voicemails not included in the indictment were not true threats; (4) all voicemails were left within a short timeframe, outside business hours, and on a single office line; and, (5) the voicemails were heard the next day all at one time.**

Mr. Shapiro objects to increasing his offense level by two levels, under § 2A6.1(b)(2)(A), for allegedly involving "more than two threats." *See* PSI ¶17 (Special Offense Characteristics). Under the facts of this case, the two-level increase under § 2A6.1(b)(2)(A) is inapplicable.

After drinking heavily on the evening of December 19, 2023, Mr. Shapiro left Congressman E.S.'s office five voicemails in less than 30 minutes starting around

1

7:18 pm. Factual Proffer, ¶1 (D.E. 25). The next day, a staff member discovered the voicemails and reported to the Capitol Police that a man had left threatening voicemails the night before. PSI ¶6. When interviewed, Mr. Shapiro said he only remembered phoning the office once, but that he had been drunk and did not remember making any threats. PSI ¶11. After agents asked him to listen to a voicemail, Mr. Shapiro commented that he sounded "like a drunk man" on the recording. PSI ¶12. Mr. Shapiro also asked the agents to pass along his apology to E.S. *Id*.

These facts are not in dispute. Mr. Shapiro submits that, where a conviction for a violation of 18 USC § 875(c) by leaving a threatening voicemail as part of a series of calls over a less than 30-minute period outside of regular business hours to the same office phone number of a single victim who received voicemails of the calls all at once, the offense reasonably constitutes a single "true threat" and certainly does not establish "more" than two threats.

Under a single count of the Indictment, the government charged Mr. Shapiro, "with the intent to communicate *a* threat and with the knowledge that it would be viewed as *a* threat," left Congressman E.S. "*a* voicemail recording." D.E. 13 (emphasis added). The Indictment included redacted excerpts from the recording:

> Hey mother-[expletive], you [expletive] a Chinese spy. You mother-[expletive], I'm gonna come after you and kill you [expletive] . . . .

> Hey greaseball, you [expletive] a [expletive] Chinese spy. Fang Fang. Fang Fang. I'm gonna come and kill your children you mother-[expletive]. I'm gonna kill your children.

*Id*. Other voicemails contained colorful language and relevant context, but were not "true threats." *See* Factual Proffer, ¶1 (D.E. 25).

In *United States v. Suzanne Kaye*, the government agreed that the "multiple threats" enhancement did not apply to a defendant indicted under 18 U.S.C. § 875(c) of two counts of making threats. Govt.'s Resp. to Def.'s Objections, *United States v. Kaye*, 21-cr-80039-RLR (S.D. Fla. September 27, 2022) (D.E. 145). Kaye recorded two cellphone videos threatening the FBI and posted the approximately 60-second videos on three social media platforms. *Id*. The FBI learned of the videos days later. Kaye was indicted in two counts for making threats in violation of 18 U.S.C. § 875(c). Superseding Indictment, *Kaye*, 21-cr-80039-RLR (March 24, 2022) (D.E. 86). The jury acquitted Kaye of one count, but the probation office included in the PSI a two-level enhancement for "multiple threats" under § 2A6.1(b)(2)(A). Govt.'s Resp. (D.E. 145). The Court agreed with the parties and did not apply the "multiple threats" enhancement.

Similarly, Mr. Shapiro submits that his single drunken episode of calls to the same person in under 30 minutes outside regular business hours does not qualify for the § 2A6.1(b)(2)(A) enhancement, especially where he was only charged with making one "true threat" and the victim only learned of the threats all at once the next day. Certainly, Mr. Shapiro could be eligible for this enhancement if he made separate calls on different days for weeks or months to E.S., but those are not the facts here. Mr. Shapiro could also be eligible for the multiple threats enhancement if he threatened multiple elected leaders. If Mr. Shapiro approached E.S. in person and threatened him, later called his office and left the voicemails, and then later wrote him a letter, then Mr. Shapiro could be charged with multiple threats. But Mr. Shapiro's

conduct involved only one "true threat," during one drunken episode, and this Court should reject probation's recommendation to impose a two-level increase for involving multiple threats.

### OBJECTION II

**Mr. Shapiro's offense level merits a four-level reduction pursuant to § 2A6.1(b)(6) because his "offense involved a single instance evidencing little or no deliberation."**

All available evidence points to a single criminal episode that occurred with little or no deliberation and while Mr. Shapiro was extremely intoxicated. This single drunken episode resulted in an indictment for one violation of 18 U.S.C. § 875(c) for leaving "*a* voicemail recording" "with the threat to communicate *a* threat." *See* DE 13 (emphasis added). Afterward, Mr. Shapiro could not remember making the threats and said it was not his intent to harm anyone. He immediately asked the agents to pass along his apology to the Congressman victim. Notably, Mr. Shapiro did not call the Congressman on any later occasion or attempt to reach out to him in any other manner. These facts, contrary to probation's offense level computation, *see* PSI ¶¶17-25, support a four-level reduction, under U.S.S.G. § 2A6.1(b)(6), because the offense involved a single instance evidencing little or no deliberation and subsection (a)(2) does not apply.

United States Sentencing Guideline § 2A6.1(b)(6) applies to threats to injure a person or property when the "**offense involved a single instance evidencing little or no deliberation**." U.S.S.G. § 2A6.1(b)(6) (emphasis added). There is no definition in the guideline or commentary for what comprises an "instance." Undersigned would submit that "instance" is not synonymous with an "instant." The Cambridge

dictionary definition is instructive, as it defines an instance as "a particular situation, event, or fact, especially an example of something that happens generally." *Instance*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/instance (last accessed July 9, 2024). Mr. Shapiro's drunken voicemails created a single "situation" or "event" when the staffer listened to them the next morning. The inebriated messages comprise a single instance that was encompassed by a single count of the Indictment.

As for "deliberation," all evidence points to conduct performed with little or no deliberation or foresight as a spontaneous reaction to reports about a politician's suspected impropriety. While drinking at home that evening, Mr. Shapiro became upset by reports that the Congressman was engaged in a sexual relationship with a Chinese spy, Factual Proffer, ¶5 (D.E. 25), allegations that were the subject of a House Ethics Committee probe. Mr. Shapiro remembers reacting to the news by calling the Congressman to confront him about the alleged impropriety. *Id*. Mr. Shapiro does not, however, remember making any threats. *Id*. The lack of evidence that Mr. Shapiro took any steps to carry out his threat or that he publicized or encouraged others to engage in threatening behavior also weighs against a finding of deliberation or planning.

The facts here resemble those in *United States v. Robert Pratersch*, in which the defendant received a four-level reduction. *See United States v. Pratersch*, 808 Fed. Appx. 768 (11th Cir. 2020) (unpublished). Pratersch made three calls to Bernie Sanders, and made threats in each of call. The threats were as follows:

<u>First Message (4:43 p.m.)</u>

Bernie, you Jew bastard. You had your chance. Now we're going to be-head you ISIS style video taped for the world to see. [Inaudible] f--king hoes you got working for you. What do you got them sucking your c--k too? You freak bastard.

<u>Second Message (5:12 p.m.)</u>

Bernie you f--king Jew bastard. How's the knife going to feel cutting your head off boy? You Jew f--king cocks--ker.

<u>Third Message (5:13 p.m.)</u>

You p--sy ass f--king Bernie Sanders c--cks-cker. Leave your name and address we'll get back to you. You motherf--ker. Listen you Jew f--king cocks--ker. You're dead. You're f--king dead.

*Pratersch*, 808 Fed. Appx. at 769 n.2. Probation determined that Pratersch's conduct constituted a single instance with little or no deliberation and thus recommended a four-level decrease. Brief of the United States, *United States v. Pratersch*, 2019 WL 7424935, at *3 ("In the PSR, the United States Probation Office recommended . . . a four-level reduction under section 2A6.1(b)(1), because the offense involved a single instance evidencing little or no deliberation"). Neither party objected to probation's guideline calculation that included the four-level reduction. *Id*. Although the court the court found that a downward variance was inappropriate due to Pratersch's fail-ure to accept responsibility and untruthful trial testimony, the court nevertheless imposed a bottom-of-the-guidelines sentence of fifteen months. *Id*. at *6.

Another defendant, who, like Shapiro, made threats during a call to a congress-man, also received a four-level reduction under section 2A6.1(b)(1). *United States v. Frank Stanzione*, 23-cr-80064-RS. On January 29, 2023, at around 10 p.m., an anon-ymous caller left this voicemail on the telephone line for the office of United States Representative George Santos:

6

[Victim 1] you fat [expletive] piece of [expletive]. You better watch your [expletive] back because I'm gonna bash your [expletive] head in with a bat until your brains are splattered across the [expletive] wall. You lying, disgusting, disgraceful, [expletive]. You [expletive] piece of [expletive]. You're gonna get [expletive] murdered you goddamn lying piece of garbage. Watch your back you fat, ugly, piece of [expletive]. You and [Victim 2] are dead.

Indictment, *Stanzione*, 23-cr-80064-RS (DE 1) (April 4, 2023). Representative Santos' chief of staff reported the message the next morning to the United States Capitol Police, who ascertained that the call was made from Stanzione's phone number. After a jury found Stanzione guilty, the government objected to a four-level single instance reduction under section 2A6.1(b)(1) because he conveyed multiple threats during the call. Judge Smith granted Stanzione the four-level reduction he sought and sentenced Stanzione to two years of probation.

As in the cited cases, the facts here four-level reduction, under U.S.S.G. § 2A6.1(b)(6), because Mr. Shapiro's inebriated voicemail recording made in reaction to news about the Congressman's alleged impropriety constituted a single instance evidencing little or no deliberation.

## OBJECTION III

**A departure or variance under § 2A6.1 Note 4(A) is appropriate because Mr. Shapiro lacked any intent to carry out his threat and there was little likelihood of him doing so and thus his offense falls towards the low end of the range of conduct covered by the guideline.**

The PSI failed to consider the built-in departure and variance provision in Note 4(A). *See* PSI ¶¶17-25. This Court should apply a departure or variance pursuant to the commentary in the §2A6.1 guideline, which at Note 4, states:

> **In General.**—The Commission recognizes that *offenses covered by this guideline may include a particularly wide range of conduct* and that it is not possible to include all of the potentially relevant circumstances in the offense level. *Factors not incorporated in the guideline may be considered by the court in determining whether a departure from the guidelines is warranted. See* Chapter Five, Part K (Departures).

§2A6.1 N.4(A) (emphasis added).

Importantly, to help the Court determine the "seriousness" of the "wide range of conduct" covered by the §2A6.1 guideline, the "Background" provision of the guideline states:

> **Background:** These statutes cover a wide range of conduct, the seriousness of which depends upon the *defendant's intent and the likelihood that the defendant would carry out the threat*. The specific offense characteristics are intended to distinguish such cases.

§2A6.1 N.4 Background. Therefore, the Court must consider Mr. Shapiro's intent when making the calls and the likelihood that he would carry out the threat when imposing a sentence and when determining whether a departure is warranted. In evaluating these two factors, it is clear that Mr. Shapiro's threats are less severe than many others types of threats included in the guidelines.

Such an analysis, while focused on Mr. Shapiro's intent and likelihood he would carry out the threat, is consistent with a review of the "nature of the offense" under 18 U.S.C. § 3553(a). Mr. Shapiro did not intend to carry out the threat, he did not have the capability to carry out the threat, and he did not attempt to carry out the threat. This case involves long-distance phone calls. Mr. Shapiro was, at all times, across the country and hundreds of miles away from E.S. Mr. Shapiro never made

any plans to travel to confront E.S. in California. Mr. Shapiro did not encourage others to assist him in any plan. He did not possess a firearm and made no efforts to acquire one. He simply never intended to carry out any threat, especially one he did not even remember making. Notably, at his detention hearing, the Government conceded that there was no evidence that Mr. Shapiro intended to carry out his threat.

To be clear, Mr. Shapiro maintains his December 2023 apology to the Congressmen (made through the agents) and accepts full responsibility for his actions. As he said back in December, he understands that a person could feel threatened under these circumstances. Yet, it is important to note that Mr. Shapiro's intent to threaten was compromised by his intoxication at the time he made the calls. Therefore, this Court must consider that this is a case that involved no intention to carry out the threat, no ability to carry out the threat, no capability to carry out the threat, and solely non-face-to-face, remote communication during one single period of less than 30 minutes.

Like the commentary and background suggest, communicating a threat to harm another person who is nearby and whom they wish to harm would constitute a more dangerous situation than communicating that threat from a remote distance, since the person making the threat to a nearby victim would be more likely to have an immediate and apparent ability to carry out the threatened harm.[1] The State of

---

[1] The danger involved in remote communications still must be analyzed on a case-by-case basis, for a threat involving, for example, a mailed bomb, or mailed lethal chemical are obviously situations which remove the remote (translate, "unable to immediately carry out") factor from an interstate communication. While the conduct can be covered by the same statute, the inherent dangers are different.

9

Florida's criminalization of threatening speech makes this exact conclusion, only criminalizing threatening speech if it is "coupled with an apparent ability" to carry out the threat.[2]

Threatening communications are governed in this state by "assault" laws. Florida defines "assault" as follows:

> An "assault" is an intentional, unlawful **threat** by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent.

§ 784.011(1), Fla. Stat. (2021) (emphasis added). The Supreme Court of Florida has explained that a "threat" under § 784.011(1) is "an 'expression' of an intent or a 'communicated intent' to do violence to another." *Somers v. United States*, 355 So. 3d 887, 892 (2022). A threat's criminality under § 784.011(1) is, however, grounded in an overt act directed toward the victim. *See id*.; *Battles v. State*, 288 So. 2d 573 (holding that evidence that victim felt threatened by an intention or opportunity to commit an assault was insufficient to support an assault conviction).

Some federal threat statutes use the same common law definition of "assault" as Florida, and criminalize a threat only if there is an immediate and apparent ability to carry out the threatened communication. For instance, an "assault" on a member of Congress is a misdemeanor, as long as no injury occurs and the offender does not possess a dangerous weapon. 18 U.S.C. § 351(e). At initial glance, that statute would

---

2 As will be shown in this pleading, Florida's assault statutes are taken from the common law definition of assaults or threats.

appear to govern the conduct in this case, as Mr. Shapiro was basically accused of assaulting a member of Congress. It does not, however, because Mr. Shapiro had no immediate, apparent ability to carry out his threat. In short, this Court should not sentence Mr. Shapiro more harshly for his communication than it would for an assault.

The Court should also consider where the conduct in this case falls within the breadth of conduct encompassed by the threats guideline. For example, in 2018, Christopher McGowan was charged with one count of violating 18 U.S.C. § 875(c) "based on many 'concerning' and 'threatening' tweets McGowan sent in which he tagged or otherwise directed comments at a United States congressman." *United States v. McGowan,* 2022 WL 2654228 at *1 (W.D. Va. 2022) (unpublished). He plead guilty to that charge and was sentenced to a term of time-served and supervised release. *Id.*

Similarly, in 2023, Allan Poller was charged in the District of New Hampshire for violating 18 U.S.C. § 115(a)(1)(B) and 18 U.S.C. § 875(c) for leaving a voicemail for a U.S. Congressperson which stated: "Hi, my name is Allan Poller, A-L-L-A-N P-O-L-L-E-R, phone number []8931. And I just want to let you know, Representative [Name], if you keep on coming for the gays, we're gonna strike back and I guarantee you, you do not want to f*** with us. We will kill you if that's what it takes. I will take a bullet to your f***ing head if you f*** with my rights anymore. And then if you want to keep going down that path, you know who's next." Complaint, *United States*

*v. Allan Poller*, 23-cr-00039-LM (D.N.H. March 31, 2023) (D.E. 1) (expletives redacted). Poller was sentenced, pursuant to the government's recommendation, to a downward variance from his 10-16-month guidelines range to three years of probation.

In 2019, Darryl Albert Varnum was charged in the District of Maryland with three counts of violating § 875(c) for repeatedly calling a Congressperson's Florida office, threatening to come down to Miami and kill her if a certain bill was introduced. Sealed Complaint, *United States v. Darryl Albert Varnum*, 19-cr-00337-RDB-1 (D.M.D. July 5, 2019) (D.E. 1). "I'm gonna kill your ass if you do that bill. I swear. I will f---ing come down and kill your f---ing ass. And you're a congressperson, that's fine. I hope the f---ing FBI, CIA and everybody else hears this s---," Varnum was recorded as saying on the Congressperson's voicemail according to the complaint. *Id.* "This is the United States of America, bitch. Get the f--- out... I'll tell you what I'll come down to Miami bitch. I'll f--- you up. Like Cubans don't even know." *Id.* Varnum was sentenced to 6-months of home detention for his conduct after admitting he was drunk when he left some messages.

A higher sentence was appropriate in the District of New Hampshire, where Ryder Winegar was convicted of making a series of threats to several members of Congress. *United States v. Winegar,* 21-cr-00021-SM-1 (D.N.H.). Winegar, who was believed to have been armed, threatened one Congressperson, "Uh, you better support Donald Trump as your president. There has been massive fraud in this country. And if you don't support it, we're going to drag you out and we're going to hang you by

your neck to die. Good luck." Indictment, *Winegar*, 21-cr-00021-SM-1 (February 9, 2021) (D.E. 14).

He threatened a second Congressperson:

> but also, really, we're going to hang all you motherfuckers. And it really, really, it boils down to two camps. You either support our president, support liberty, and fuck this global homo, uh, vaccination Jewish agenda, or you're not. In which case we're going to fucking kill you. Do you understand? Like you can be afraid of being doxxed and be outed as a racist and all this shit, which nobody really fucking cares about because there's no consequences, or you can be scared about motherfuckers like me stringing your ass up. Yeah. So do the right goddamn thing and get behind our president and save this country and our Constitution or else you're really going to fucking regret it as the last thought that you have in your stupid little RINO brain. Get it? So stop being a RINO and fucking line up. You got it? Stupid bitch."

*Id*.

Winegar threatened a third member of Congress,

> I think, you know, I'm not only going to have to register as a Republican in the future, but I might have to come and hang you personally, like until you die, and all of your aides, including you, who are listening to this right now, like some 24 year old, uh, from Arizona named Chase or some gay name like that. Do the right thing or patriots are going to come, and we're going to fucking kill you all. You understand.

*Id*.

Winegar threatened a fourth member of Congress, "You better get behind Donald Trump or we're going to hang you, and I'm going to laugh, and I' going to pee in your face, and I'm going to fuck your ass, you stupid fucking Democrat, piece of shit, communist [inaudible]." *Id*. He threatened that member again, "If you're not behind this, then we're going to hang you to die. Do the right thing, or you're going to get

caught being a fucking Communist, like a Chinese Communist Party, or actually, yeah. [foreign language] We're going to hang you to death. You understand that?" *Id.*

He threatened yet another member of Congress, "Like we're going to come hang you, you specifically. And I know who you are." *Id.*

Winegar threatened a sixth member of Congress, and their aides, "If you don't get behind him, we're going to hang you until you die. Uh there's there's no other option. You, there's two roads right now." *Id.*

Winegar was charged with six counts of violating 18 U.S.C. § 115(a)(1)(B), and one count of violating 18 U.S.C. § 875(c). He plead guilty to the indictment. Plea Agreement, *Winegar*, 21-cr-00021-SM-1 (July 27, 2021) (D.E. 26). He was sentenced to the bottom of his guidelines range, 33-months imprisonment. Judgment, *Winegar*, 21-cr-00021-SM-1 (December 2, 2021) (D.E. 39).

Conversely, in 2021, Robert Lemke was charged in the Southern District of New York with violating 18 U.S.C. §875(c) after he sent a series of threats to a New York Congressman's brother during the January 6th attack on the Capitol. *United States v. Robert Lemke*, 21-cr-00100-AKH-1 (S.D.N.Y.). The threatening communications included a photo of a home in the brother's neighborhood and a text stating, "Your brother is putting your entire family at risk with his lies and other words. We are armed and nearby your house." Indictment, *Lemke*, 21-cr-00100-AKH-1 (February 16, 2021) (D.E. 4). "You had better have a word with him. We are not far from his either. Already spoke to [Congressman-1's son] and know where his kids are." *Id.* According to the United States' sentencing submission in that case:

> The defendant engaged in a concerted campaign, sustained **over more than two months, to terrify and intimidate dozens of journalists, members of Congress, and their families** in the wake of the 2020 U.S. presidential election. He hunted his victims over the internet, amassing information about their private lives. He deliberately took steps to mask his identity, acquiring at least two extra phone numbers to use in threatening his victims. As he hid behind the anonymity of those numbers, he terrified his victims by explicitly threatening to harm them while also conveying detailed knowledge of their lives, their loved ones' names, their addresses, and even sending photographs that were personal to them, such as images of the inside of homes belonging to them and their family members. The victims feared for their safety, and that of their children, their parents, and their partners.

Sentencing Submission by U.S.A., *Lemke*, 21-cr-00100-AKH-1 (December 13, 2021) (D.E. 47) (emphasis added). Lemke was sentenced to 36-months imprisonment. Judgment, *Lemke*, 21-cr-00100-AKH-1 (January 24, 2022) (D.E. 55).

In 2023, Robert Vargo was charged with violating 18 U.S.C. § 871, 875 and 115(a)(1)(B) for mailing threats to kill several victims, including a U.S. Congressman, the President, and a United States District Judge, and their families. Indictment, *United States v. Robert Vargo*, 22-cr-00366-JRS-1 (M.D. Pa. October 18, 2022) (D.E. 1). Vargo pled guilty to the § 875(c) count and was sentenced by the Judge to a term of 37-months imprisonment. Judgment, *Vargo*, 22-cr-00366-JRS-1 (May 1, 2023) (D.E. 32). According to the government, the judge noted Vargo's lengthy criminal history and the disturbing nature of the threats in imposing the 37-month sentence. https://www.justice.gov/usao-mdpa/pr/columbia-county-man-sentenced-threatening-president-congressman-bennie-thompson-and (last accessed July 11, 2024). Further, Vargo's federal sentence will begin after he finishes serving a three to six year term in state prison for a 2022 escape conviction. *Id.*

15

In 2018, Carlos Bayon was convicted by a jury of two counts of interstate communication of a threat and two counts of assault on a Congressperson in violation of 18 U.S.C. § 875(c) and 115(a)(1)(B) after leaving voicemails for a Congressperson which stated:

> hey listen, this message is for you and the people that sent you there. You are taking ours, we are taking yours. Anytime, anywhere. We know where they are. We are not going to feed them sandwiches, we are going to feed them lead. Make no mistake you will pay. Ojo por ojo, diente por diente (Spanish for "an eye for an eye, a tooth for a tooth"). That is our law and we are the majority. Have a good day.

https://www.justice.gov/usao-wdny/pr/grand-island-man-arrested-leaving-threatening-voicemails-two-us-congressmen (last accessed July 5, 2023). On the same day, the Washington State office of another United States Congressman received a threatening voicemail with the exact same message. *Id*. Both calls were traced to Bayon. *Id*. At Bayon's home, agents found books regarding bomb-making and "hit-men." Sentencing Memorandum by U.S.A., *United States v. Carlos Bayon*, 18-cr-00163-FPG-JJM (W.D.N.Y. November 20, 20219) (D.E. 157). Also found at Bayon's home were 150 rounds of 7.62mm ammunition for an SKS assault rifle, 50 rounds of shotgun ammunition, a receipt for the purchase of an SKS assault rifle, a receipt for the purchase of a .38 caliber revolver. No firearms were located. Trial Brief by U.S.A., *Bayon*, 18-cr-00163-FPG-JJM (D.E. 111). The books that were found included: "How to create foolproof new identity; Ragnar's homemade detonators; Homemade C-4; New & Improved C-4; Middle Eastern Terrorist Bomb Designs; Poor man's TNT; CIA field manual for explosives prep; Disguise techniques; How to circumvent security alarms; Silent But Deadly: homemade silencers; Hit Man: technical manual; Expedient B&E:

circumventing alarms; Improvised radio detonation techniques; Homemade Semtex; Secrets of a Super Hacker; How to make disposable silencers; and, How to build practical firearm suppressors." *Id*. An interview with Bayon's girlfriend revealed that he had gotten her to purchase the SKS rifle and ammunition for him, and that he admired Timothy McVeigh, "sympathized with David Koresh," and travelled to Colorado to have his picture taken by the school where the Columbine shooting had taken place. *Id*. Finally, after searching a storage unit the Defendant rented, agents found the SKS rifle and bomb-making materials. *Id*. Bayon was sentenced above Guidelines to 60-months imprisonment. *Id*. at D.E. 159.

In *United States v. Troy Smocks*, 21-cr-00198 (D.D.C.), Smocks appeared before the Court with 18 prior criminal convictions, including a prior federal felony conviction and prior violations of supervision. Government's Sentencing Memorandum, *United States v. Smock*, 21-cr-00198 (D.D.C. October 15, 2021) (D.E. 59). He traveled to D.C. on January 6, 20212, and from D.C., he lied about being a retired military officer on social media and posted repeatedly to "tens of thousands" of followers to engage in violence against law enforcement, democrats, and others. *Id*. His numerous posts included language on January 6, 2021 such as:

> So over the next 24 hours, I would say, lets get our personal affairs in order. Prepare Our Weapons, and then go hunting. Lets hunt these cowards down like the Traitors that each of them are. This includes, RINOS, Dems, and Tech Execs. We now have the green light. [All] who resist Us, are enemies of Our Constitution, and must be treated as such.

*Id*. And prior to going to D.C. posted the following (among many others):

> Why Have A Second Amendment If You're Afraid To Exercise it??? . . . The United States Constitution is under seize. Put Your Guns Where

Your Mouth Is. Lets Stop The Steal." (November 24, 2020); "There is roughly 800,000 federal agents, and less than 250 Traitor Democrat members in D.C. . . . There are over 70 million of Us. We can take them!!! (November 28, 2020); "Its time for America to put its money where its mouth has been. Will it get bloody, yes. But freedom ain't free." (December 11, 2020).

*Id*. Smock received 14 months of incarceration and 3 years of supervised release. *See* Sentences Handed Down in Capitol Breach Cases, DOJ, https://www.justice.gov/usao-dc/media/1331746/dl?inline (last accessed July 11, 2024).

In *United States v. Meredith Cleveland*, 21-cr-00159-ABJ-1 (D.D.C.), Cleveland traveled to D.C. for the events on January 6, 2021 and sent several threatening text messages including threats to the FBI, Nancy Pelosi, and other "traitors." Government's Sentencing Memorandum, *United States v. Meredith Cleveland*, 21-cr-00159-ABJ-1 (D.D.C. December 8, 2021) (D.E. 54). He was intercepted by the FBI on January 6, 2021, one mile from the Capitol and in his possession were an assault-style rifle with a telescopic sight, a 9 mm semi-automatic firearm, over 2,500 rounds of ammunition, and multiple high-capacity magazines, and Cleveland knew the mere possession of these unregistered firearms in D.C. was a violation of the law. *Id*. Cleveland's threats included some of the following statements:

> [s]taying one more day since I got here late, need to FK with these commies." He also threatened that he was "[t]hinking about heading over to Pelosi CUNT's speech and putting a bullet in her noggin on Live TV." "We're going to surround DC (sic) and slowly constrict." and that he was, "[r] eady to remove several craniums from shoulders . . . (and) gonna collect a shit ton of Traitors heads." , "Strateginz (sic) . . .on best way to assault this city . . . ." He also said that he was "[s]taying one more day since I got here late, need to FK with these commies" and that he was, "[t]hinking about heading over to Pelosi CUNT's speech and putting a bullet in her noggin on Live TV." Defendant predicted ominously that "I ain't goin to jail, the morgue maybe, not jail.

*Id*. Cleveland was sentenced to 28 months in prison and three years of supervised release. https://www.justice.gov/usao-dc/defendants/meredith-cleveland.

In *United States v. Garrett Miller*, 1:21-cr-00119-CJN (D.D.C.), Miller went to the Capitol on January 6, 2021 and brought with him rope, a grappling hook, a mouth guard, and a bump cap – tools that he referred to as "riot gear" – and stated that he "looked forward" to fighting what he called the "soft" law enforcement officers in Washington, D.C. Sentencing Memorandum of U.S.A., *United States v. Garrett Miller*, 1:21-cr-00119-CJN (February 16, 2023) (D.E. 141). He used social media to threaten everyone from Senator Charles Schumer to Mark Zuckerburg and Jack Dorsey. *Id*. According to the government:

> Miller did more than just participate in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses. Miller was at the forefront of every barrier overturned, police line overrun, and entryway breached within his proximity that day. He was so disruptive on the East Front of the building that he was twice detained, the second time resulting in him being put in handcuffs. After being released and vowing to leave, Miller instead stayed at the riot, initially filming himself talking about a revolution assaulted an MPD Sergeant, and engaged in a physical altercation with no fewer than six officers. But Miller still wasn't done. At 7:26 p.m., in response to Congresswoman Ocasio-Cortez's social media post to "Impeach," Miller directly responded: "Assassinate AOC." Following the riot and up until his arrest, Miller continued to discuss his desire to "start assassinating," bragged to his friends about how he "terrified [c]ongress," and openly discussed his desire to doxx the officer who shot Ashli Babbitt and "hug his neck with a nice rope." Miller was so proud of his conduct, that when he was arrested on January 20, 2021, he was found wearing a shirt with an image of the former president and the words "I was there, Washington, D.C., January 6, 2021.

*Id.* For the totality of his unlawful conduct, Miller was sentenced on 11 charges, including assaulting officers, violent entry into the Capitol, § 875(c) threats, civil disorder, and others, and he received a sentence of 38 months in prison and 3 years of supervised release. https://www.justice.gov/usao-dc/media/1331746/dl?inline.

Viewed within this broad range of threatening communication illustrated with these examples, Mr. Shapiro's conduct clearly falls at the low end of the range   where he intent to threaten was minimal and he could not and would not carry out his threat. Thus, the Court should downward vary in its sentence.

Respectfully submitted,

HECTOR A. DOPICO
Interim Federal Public Defender

*s/ Kristy Militello*
Kristy Militello
Assistant Federal Public Defender
Attorney for the Defendant
Florida Bar No. 0056366
250 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
(561) 833-6288 - Telephone
Kristy_Militello@fd.org

CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/ Kristy Militello*
Kristy Militello